# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**DAVID L. ROBY,**

   **Plaintiff,**

**vs.**             **CIVIL ACTION NO. 5:21-CV-00505**

**MARTIN J. WALSH,**
**Secretary, Department of Labor**
**(Mine Safety & Health Administration),**
**TERRY G. MONTGOMERY,**
**Chief, National Air and Dust Lab,**
**GEORGE GARDNER,**
**Chief, Pittsburgh Safety and Health Technology Center,**

   **Defendants.**

### <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

Pending before the Court is ***<u>Defendant's Motion to Dismiss or in the Alternative Motion</u>*** ***<u>for Summary Judgment</u>*** (ECF No. 23). By Standing Order entered on September 7, 2021, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 2) Having examined the Complaint, the additional pleadings of record, and after having considered the pertinent legal authority and the arguments of the parties, the undersigned has concluded that the Defendants' ***<u>Motion</u>*** should be **GRANTED** for the reasons stated *infra*:

### Plaintiff's Factual Allegations

On September 7, 2021, Plaintiff filed a "Complaint for Employment Discrimination" (ECF No. 1). Plaintiff alleged the Department of Labor (DOL), Mine Safety and Health Administration

(MSHA), and its agents committed numerous violations to the Age Discrimination in Employment Act (ADEA) (29 U.S.C. §§ 621-634), the Americans with Disabilities Act (ADA) (42 U.S.C. §§ 12112-12117), the Rehabilitation Act (29 U.S.C. §§ 701 *et seq*.), the Family and Medical Leave Act (FMLA) (42 U.S.C. § 825), the DOL's DLMS 6-200: Reasonable Accommodations for Employees and Applicants and DLMS 4 – Chapter 306 – Reasonable Accommodations for Employees and Applicants with Disabilities, as well as the DOL's Policy & Procedures for Preventing & Eliminating Harassing Conduct in the Workplace and DOL Workplace Violence Program.[1] (Id. at 3, 5) Plaintiff alleged that the violations occurred while he was employed from August 9, 2017 through December 9, 2017 when he was terminated, and even after he was terminated on April 10, 2018. (Id. at 4) Specifically, Plaintiff alleges the following:

1. On August 9, 2017, Plaintiff's direct supervisor, Defendant Montgomery, verbally and physically threatened Plaintiff, creating a hostile work environment; Plaintiff asserts that Defendant Montgomery had previously approved reasonable accommodations for Plaintiff's service-related disabilities and that on that day, Plaintiff had a medical appointment at the Beckley VAMC this Defendant was aware of. (Id. at 7)

2. On August 14, 2017, Plaintiff requested Reasonable Accommodation from his second level supervisor, Defendant Gardner. (Id.) This request was forwarded to Paul Sutton, Management Analyst, which violated confidentiality requirements. (Id.)

3. On August 15, 2017, during a telephone discussion with Defendant Montgomery about Plaintiff's attendance, Defendant Montgomery laughed at Plaintiff's "concern over the

---

[1] Plaintiff attached an exhibit to his Complaint, a Decision issued by the U.S. Equal Employment Opportunity Commission, dated June 8, 2021, which affirmed the underlying Agency's finding no discrimination. (ECF No. 1 at 12-17)

incident at work" and threatened him with leave without pay. (Id.)

4.  After the telephone discussion, on August 15, 2017, Defendant Montgomery emailed Plaintiff threats of "leave denial, AWOL[2], and disciplinary action including removal from federal service." (Id.)

5.  On August 15, 2017, Defendant Montgomery also emailed Plaintiff and copied multiple DOL employees regarding Plaintiff's Reasonable Accommodation request, thereby violating confidentiality requirements. (Id.)

6.  On August 15, 2017, Janet Callwood, EEO Specialist/Team Lead also emailed Plaintiff concerning his Reasonable Accommodation request and copied multiple DOL employees, thereby violating confidentiality requirements. (Id. at 8)

7.  On August 21, 2017, Plaintiff's Reasonable Accommodation request was denied; it was not processed according to law and the Agency's own guidance, and Plaintiff's rights were violated by Defendants DOL, Gardner and Montgomery. (Id.)

8.  On October 2, 2017, Plaintiff officially filed an allegation of harassment with the OASAM[3] Equal Employment Opportunity Office and filed an official grievance through his AFGE[4] Union because he learned that Defendant Montgomery had disclosed Plaintiff's confidential medical information to Joseph Robertson, Laboratory Technician Supervisor, and another individual. (Id.)

9.  On October 2, 2017, following Plaintiff's filing of the aforementioned grievances, Plaintiff's FMLA request was improperly administered by Defendants Montgomery and

---

[2] **A**bsent **With**out **L**eave
[3] **O**ffice of the **A**ssistant **S**ecretary for **A**dministration and **M**anagement
[4] **A**merican **F**ederation of **G**overnment **E**mployees

Gardner, by cutting short the 12 weeks of FMLA that would have been available to Plaintiff. (Id. at 9)

10. On October 3, 2017, Plaintiff officially filed an allegation of harassing conduct with the OASAM Equal Employment Opportunity Office and an official grievance through his AFGE Union. (Id.) Plaintiff was informed by Paul Sutton that his request to extend his advanced annual and sick leave by thirty days was denied. (Id.)

11. On October 13, 2017, Plaintiff made a second request to Defendant Gardner to be reassigned to a different position, per his previous Reasonable Accommodation request; Plaintiff advised Defendant Gardner of three positions, but his request was ignored, and Plaintiff was directed to complete a request to be placed on a Hardship Transfer list. (Id.)

12. On November 8, 2017, Paul Sutton informed Plaintiff that he would no longer be accommodated with any type of leave and that he would have to return to work after exhausting his Leave Without Pay; Plaintiff was threatened with AWOL and Medical Disqualification. (Id.)

13. On December 9, 2017, Plaintiff was forced to resign due to the difficult, unpleasant, and intolerable working conditions created by Defendants DOL, Gardner and Montgomery. (Id. at 10)

14. On April 10, 2018, Plaintiff discovered Defendant Gardner provided incorrect and unnecessary information about Plaintiff in an employment questionnaire for a background check when Plaintiff was selected for a position with the Department of Veterans Affairs. (Id.) Plaintiff had to explain and correct this for the investigator. (Id.)

15. From August 9, 2017 through November 11, 2017, Defendant Montgomery engaged in violent and then harassing conduct against Plaintiff. (Id.)

4

Plaintiff asks for money damages for lost wages, retirement benefits, other employment benefits plus interests on same; $300,000 for compensation for mental anguish, inconvenience, loss of enjoyment of life, emotional harm, deterioration in health, loss of social standing, damage to reputation, and pain and suffering; $300,000 in exemplary damages; "[t]hat the Court retain jurisdiction over this action until the Defendant has fully complied with Orders of this Court and that the Court require Defendant to file such reports as may be necessary to supervise such compliance"; attorneys' fees and costs during the administrative process; and for such other and further relief. (Id. at 11)

## PROCEDURAL HISTORY

On September 7, 2021, Plaintiff, acting *pro se*[5], filed his Complaint citing employment discrimination against Defendants. (ECF No. 1)

On November 22, 2021, Defendants filed their motion to dismiss for failure of service of process, however, this deficiency was subsequently cured by Plaintiff, which was conceded by Defendants; ultimately, the issues raised in the motion were deemed moot by the Court. (See, ECF Nos. 7, 8, 12-18, 20, 21)

Following entry of the undersigned's Order to file an answer or response to Plaintiff's Complaint no later than February 2, 2022 (ECF No. 22), Defendants filed their motion to dismiss, or in the alternative motion for summary judgment (ECF No. 23), along with its supporting memorandum of law (ECF No. 24) and five exhibits: (1) a copy of the "Decision and Order of Judgement" from the underlying proceedings before the U.S. Equal Employment Opportunity

---

[5] Because Plaintiff is acting *pro se*, the documents which she has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. See Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Commission (hereinafter "EEOC") entered by the Administrative Judge ("AL") on September 23, 2019, finding in favor of the Agency that discrimination had not been established by Plaintiff; (2) a copy of the "Agency's Motion to Dismiss the Complaint" filed with the EEOC; (3) a copy of the final decision of the Agency, U.S. Department of Labor, dated January 14, 2020 sent to Plaintiff via UPS; (4) a copy of the "Decision" by the Agency dated June 8, 2021, affirming the final decision below; and (5) a copy of the pertinent "Absence and Leave" provisions under Section 630 concerning certain federal employees (ECF Nos. 23-1, 23-2, 23-3, 23-4, 23-5).

Subsequent to the undersigned's entry of the Roseboro notice (ECF No. 25), on February 3, 2022, Plaintiff filed his response in opposition to Defendants' motion (ECF No. 26), a memorandum of law in support of his opposition (ECF No. 27), as well as several voluminous exhibits (ECF Nos. 28-30, 33): a copy of the U.S. Department of Labor Manual Series, DLMS-4, Chapter 306 – Reasonable Accommodations for Employees and Applicants with Disabilities; a copy of DPR Chapter 630 governing Absence and Leave provisions; a copy of DPR Chapter 610 governing Hours of Duty and Alternative Work Schedules; copies of performance appraisals of Plaintiff by Defendant Montgomery dated July 2012 through April 2016; copies of emails between Plaintiff and other Agency personnel dated August 2017 and July 2018; and a thumb drive that contains the 1625 page EEOC Report of Investigation in .pdf format from the underlying proceedings.

Accordingly, this matter has been fully briefed and ready for decision.

### Defendants' Argument in Support of Dismissal/Summary Judgment

Defendants assert that each count in Plaintiff's Complaint is a conclusory statement that merits dismissal, and the exhibits filed in support of their argument demonstrate that the DOL had

legitimate, non-discriminatory reasons for its actions. (ECF No. 24 at 6-7)

Plaintiff's claims stem from a single incident with his immediate supervisor, Defendant Montgomery, on August 9, 2017: that he spoke to Plaintiff in a very angry tone, punched his fists on his desk, lunged at Plaintiff and told him to sit, as he was frustrated that Plaintiff had taken a two-and-a-half-hour lunch and failed to respond to his text message to explain the delay. (Id. at 7-8) Defendant Montgomery had counseled Plaintiff on this issue before, and although Plaintiff alleged there is a two-hour lunch policy, and that other employees were afforded this without issue, he provides no supporting documentary evidence for same. (Id.) Regardless, Defendant Montgomery's allegedly losing his temper undercuts Plaintiff's contention of a two-hour lunch policy, and Plaintiff presents no evidence that Defendant Montgomery's actions that day were pretextual and the result of impermissible discrimination. (Id.)

Regarding the incident on August 15, 2017 concerning the email sent by Defendant Montgomery to Plaintiff that he would be placed on "leave without pay" status for failure to report for duty without notification – this was the result of Plaintiff being absent from work for three and a half consecutive days. (Id. at 8) In order to justify his absences and failure to notify that he would be absent, Defendant Montgomery advised Plaintiff to submit proper medical documentation pursuant to the pertinent collective bargaining agreement between Plaintiff's union and the DOL, as well as to the DOL's policy on sick leave. (Id. at 9) Plaintiff presents no evidence that similarly situated employees were treated more favorably than he and no evidence of pretext; the DOL had legitimate, non-discriminatory reasons for Defendant Montgomery's email. (Id.)

On August 16, 2017, Plaintiff requested a reasonable accommodation that was denied on August 21: he wanted to be able to telework full-time as he could no longer come into the office

7

while Defendant Montgomery was there due to the August 9, 2017 episode and subsequent actions. (Id.) Plaintiff refused contact with Defendant Montgomery and was essentially asking for a different supervisor – his reasonable accommodation request was therefore unreasonable on its face and the DOL was not required to grant it. (Id.)

Plaintiff's claims that Defendant Montgomery's emails to him from August 2017 through November 2017 were harassing also have no factual support – Defendant Montgomery's emails concerned legitimate, non-discriminatory reasons: the August 15, 2017 email, *supra*; the October 2, 2017 email concerned Plaintiff's request for FMLA leave through November 7, 2017; the November 2 and 6, 2017 emails were copied to other office staff reminding them to complete mandatory on-line training; and the November 7, 2017 email concerned Plaintiff's possession of a government computer when he had been out of the office for almost three months that was not assigned to him, but intended to be shared among staff for telework, training, travel, etc. (Id. at 9-10)

Plaintiff's claim that the September 6, 2017 denial of his request for advanced annual and sick leave would not be extended by thirty days also lacks any evidence of pretext of impermissible discrimination, but shows legitimate, non-discriminatory reasons: Defendant Montgomery recommended Plaintiff's request be denied in accordance with DOL policies to not advance leave where it appears doubtful the employee would be able to pay them back. (Id. at 10-11) At the time, Plaintiff had a zero annual leave balance and a negative 152 hours sick leave balance and a years-long history of maintaining low leave balances – none of which Plaintiff disputes. (Id. at 11) Further, Plaintiff's unreasonable assertion that he would return to work so long as he had no contact with Defendant Montgomery, discussed above, only underscores the doubtfulness of his being able

to pay back any additional advance leave. (Id.)

Plaintiff's claim that Defendant Montgomery disclosed confidential medical information about him to Joseph Robertson, a lab technician supervisor, on October 2, 2017 also has no evidence of discrimination. (Id. at 11-12) At that time, Defendant Montgomery was out on approved leave, from September 28, 2017 through October 9, 2017, and Mr. Robertson was acting in his place as the Acting Division Chief. (Id.) While on leave, Defendant Montgomery was directed by his supervisor, Defendant Gardner, to process Plaintiff's approved Leave Without Pay under the FMLA as soon as possible. (Id.) Accordingly, Defendant Montgomery emailed Mr. Robertson to send a certified copy of the paperwork to Plaintiff, as well as to scan and email same to him, because it was the fastest way to get the information to Plaintiff. (Id.) Plaintiff does not object to Defendant Montgomery's handling his confidential information, only that Mr. Robertson had, but fails to appreciate that Mr. Robertson was acting in Defendant Montgomery's capacity while on leave, and therefore had the authority to carry out his responsibilities. (Id.) A federal employer has a legal obligation to inform an employee whether or not requested leave will be designated as FMLA. (Id.) Had Defendant Montgomery not involved Mr. Robertson, Plaintiff would have had to wait until October 9, 2017 when he returned to the office; Defendant Montgomery's actions do not show discrimination or that Plaintiff was treated unfavorably, but were in accordance with the law. (Id.)

Plaintiff's claim that the November 8, 2017 notification by a human resources specialist that he would no longer be accommodated with leave and to return to work after exhausting his Leave Without Pay or that he could be considered AWOL or medically disqualified also lacks any evidentiary support of being discriminatory or based on pretext. (Id. at 13-14) Plaintiff was warned

on October 2, 2017 that his FMLA leave would expire on November 7, 2017. (Id.) Mr. Paul Sutton, Management Analyst (not a human resources specialist) emailed Plaintiff on November 8, 2017 reminded Plaintiff his FMLA expired, but also generously provided him an additional two weeks of Leave Without Pay and that the search would continue to find Plaintiff another position in the geographic area in accordance with the DOL's obligation to attempt to reassign Plaintiff as an accommodation of last resort. (Id.) Because Plaintiff's own medical documentation and ongoing insistence he have no contact with Defendant Montgomery, his medical ability to continue in his job became an issue – Mr. Sutton's email informing him that if Plaintiff could not return to work, Plaintiff would be Absent Without Leave and could be medically disqualified was accurate and in accordance with the pertinent EEOC policies. (Id.)

Plaintiff's claim that he was constructively discharged on December 9, 2017 is an amalgamation of his other claims, and also lacks any evidentiary support – there were no other job vacancies despite the DOL's efforts to find one; Plaintiff voluntarily resigned and immediately took a new position with the Veterans Administration ("VA"). (Id. at 14-15)

Finally, Plaintiff's claim that on April 10, 2018 he discovered that a source at MSHA provided incorrect information about him to a background investigator – that he separated from DOL by "mutual agreement", but instead was forced to resign after extended absence caused by DOL – lacks evidentiary support. (Id. at 15) Defendant Gardner spoke with a VA employee and completed an "OPM INV FORM 41", an Investigative Request for Employment Data and Supervisor Information, and did not mention "mutual agreement" on the form, but correctly stated that "[Plaintiff] resigned after extended absence due to medical disability aggravated by conflict with supervisor – I am second level supervisor." (Id.)

Defendants argue that the alleged DOL actions, either individually or in the aggregate, do not constitute a hostile work environment – prior to the August 9, 2017 meeting with Defendant Montgomery, Plaintiff made no allegations of harassing conduct nor filed any EEO claims against him. (Id. at 16) Approximately one hour after the meeting, Plaintiff left the office at 3:00 p.m. and never returned. (Id.)

Because Plaintiff's claims fall under Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, Defendants Montgomery and Gardner are improper defendants, the only properly named defendant in this case is the Secretary of Labor. (Id. at 17)

In light of the foregoing, Defendants are entitled to summary dismissal. (Id. at 18)

**Plaintiff's Response in Opposition**

Plaintiff asks the Court to dismiss Defendants' motion, and acknowledges that while the AJ issued a decision on September 23, 2019, Plaintiff asserts that prior to the issuance of this decision, he was unable to file his opposition to the Agency's motion timely due to personal and medical issues, and the affirmation of the final decision was based on procedural issues and not on the merit or evidence presented by Plaintiff. (ECF No. 26)

Plaintiff argues that his "motion for summary judgment" should be granted (ECF No. 27 at 8). Plaintiff contends that Defendants did in fact discriminate against Plaintiff based on his disability. (Id. at 9) Plaintiff asserts that he has shown Defendants' actions subjected him to a hostile work environment that culminated in his constructive discharge when they failed to grant him reasonable accommodation. (Id. at 10-11)

Plaintiff asserts that Defendant Montgomery "did more than 'raise his voice' he was in fact extremely angry", and lunged forward at him, and further states that "Gail Morgan, Manager

11

Fayette Federal Credit Union . . . heard an individual yell but could not tell who it was[]" shows that Plaintiff "had no reason to make these allegations ups and that they are factual." (Id. at 11-12)

Plaintiff states there was no official requirement that he take leave or otherwise advise his supervisor of his whereabouts for lunch, and that he was using his lunch time for medical appointments as he often did; he disputes that he was gone from the office and unresponsive to his supervisor for two-and-a-half hours on August 9, 2017. (Id. at 13) Plaintiff asserts that he was already at his desk when Defendant Montgomery had sent his text at 1:44 p.m. (Id.) Plaintiff indicates that he has a recording of Defendant Montgomery and Nicole Lisko from OASAM regarding the lunch period policy that was not from 11:30 to 1:30 but there was not a stipulated range.[6] (Id. at 13) Plaintiff states that the recording states that Defendant Montgomery said that "[M]y unwritten policy which is, I've always followed since day one has been if you leave for lunch at 11:30 and you're back in the office by 1:00 you'll never hear a complaint from me and nobody abuses that except Mr. Roby, nobody abuses that policy." (Id.)

Plaintiff asserts that he enjoyed a flextime schedule that permitted him to perform work duties from 6 am to 8 pm, thus any urgent statements by Defendant Montgomery regarding tracking a maintenance kit ordered by Joseph Robertson are "overinflated" and allowed him "the opportunity to verbally and physically threaten the Plaintiff." (Id. at 14) Plaintiff also disputes that Defendant Montgomery counseled him or found Plaintiff had poor work performance. (Id.)

Plaintiff states he has a recording of his conversation with Defendant Montgomery prior to receiving the August 15, 2017 email regarding his absences (Id. at 15-17) Plaintiff contends that

---

[6] Plaintiff states he "took it upon himself to record the meeting since it was apparent Mr. Montgomery was predisposed to lying from the start." (Id. at 13)

he emailed Defendant Gardner (and Mr. Paul Tisak) on August 14, 2017 that he was unable to go into the office because of Defendant Montgomery's conduct and was unable to see a mental health counselor until August 16, 2017 and thereafter provided proper medical documentation to Defendant Montgomery for his absences and for his Reasonable Accommodation request. (Id. at 17-18)

Plaintiff argues that Defendants were fully aware of his service-connected disability and that the majority of his work was computer-based – most of which could be completed online and that the small remainder could have been performed during the evening hours, which would have accommodated him as Defendant Montgomery aggravated his service-related disabilities. (Id. at 20-26) Despite knowing this, Defendants failed to process Plaintiff's Reasonable Accommodation request, and impermissibly denied it. (Id.) Plaintiff states that rather than proceed via Reasonable Accommodation, Defendants advised him to apply via "Regional Transfer List for a Hardship Transfer" that did not take Plaintiff's disabilities into consideration, making it apparent that Defendants did not want to retain him as an employee. (Id. at 26-28)

Plaintiff contends that after having disclosed Defendant Montgomery's and other employees were "extra-long lunch breaks and drinking on duty" put a target on his back; in addition to the Agency having little to no records of his Reasonable Accommodation request, Plaintiff was put in a situation forcing him to quit, finding another job, or being forced to return to a hostile work environment. (Id. at 28-29)

Regarding the "harassing" emails he received from Defendant Montgomery from August 2017 through November 2017, Plaintiff insists that "[t]his issue goes beyond emails" and began when he "verbally and physically threatened" and "laughed" at Plaintiff, and "provided false and

incorrect information", "provided unfounded opinions", and all this was "allowed" by Defendant Gardner and the Agency. (Id. at 29-30) Because Plaintiff had disclosed Defendant Montgomery's and other employees' misconduct since making a Reasonable Accommodation request, Defendant Montgomery started a campaign to paint Plaintiff as a trouble employee. (Id. at 30-31) As a result, nothing was done to assist Plaintiff with his disabilities. (Id. at 31-32)

Regarding the September 6, 2017 notice that his advance leave would not be extended by thirty days, Plaintiff states Defendant Montgomery ignores the fact that Plaintiff is his family's sole provider, that he never took vacation during his entire employment, that his leave was only taken for others and for his medical appointments, and that his fifteen years in federal service would have earned him eight hours of annual leave per pay period allowing for a faster payback of advanced leave. (Id. at 32-33) Plaintiff reasserts he intended to return to duty once medically cleared, but his Reasonable Accommodation or reassignment were not executed properly due to discrimination. (Id. at 34)

Regarding his confidential medical information being disclosed in October 2017, Plaintiff argues that there was no need for these disclosures to any other employees, and disputes the urgency Defendant Montgomery relies upon to have disclosed this information to Mr. Robertson. (Id. at 34-39)

Regarding the November 2017 notification that he would no longer be accommodated with leave, Plaintiff asserts that additional leave is a form of Reasonable Accommodation, and had Defendants reasonably accommodated him, he would not have needed leave through FMLA. (Id. at 39-41)

Plaintiff insists that he was constructively discharged on December 9, 2017 as the result of

14

the combination of events by Defendants. (Id. at 41-42)

Regarding Defendant Gardner's providing incorrect information to a background investigator, Plaintiff states that he could have simply marked that Plaintiff left voluntarily; instead of indicating that he left by mutual agreement due to specific problems and providing the narrative that he left after extended absence due to his disability and conflict with his supervisor; Plaintiff argues this was done for malicious purposes. (Id. at 42-44)

Plaintiff contends that he has established a *prima facie* case of a hostile work environment due to the combination of Defendants' actions that were predicated upon his disabilities and accommodation requests. (Id. at 44-45) Plaintiff further argues he established a *prima facie* case of discrimination. (Id. at 45)

## THE STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959.

15

This Court is required to liberally construe *pro se* documents, holding them to a less stringent standard than those drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Loe v. Armistead, 582 F.2d 1291, 1295 (1978). Liberal construction, however, "does not require courts to construct arguments or theories for a *pro se* plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Miller v. Jack, 2007 WL 2050409, at * 3 (N.D.W. Va. 2007) (citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)). Further, liberal construction does not require the "courts to conjure up questions never squarely presented to them." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). In other words, a court may not construct legal argument for a plaintiff. Small v. Endicott, 998 F.2d 411 (7th Cir.1993). Finally, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Department of Social Servs., 901 F.2d 387 (4th Cir. 1990)). Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 -

87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts

in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356.

Summary judgment is required when a party fails to make a showing sufficient to establish an

essential element of a claim, even if there are genuine factual issues proving other elements of the

claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary

judgment will be granted unless a reasonable jury could return a verdict for the non-moving party

on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986).

The facts and inferences to be drawn therefrom must be viewed in the light most favorable

to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the

non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

defeat a motion for summary judgment. Baber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir.

1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would

apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure provides:

A party asserting that a fact cannot be or is genuinely disputed must support the
assertion by: [] citing to particular parts of materials in the record, including
depositions, documents, electronically stored information, affidavits or
declarations, stipulations (including those made for purposes of the motion only),
admissions, interrogatory answers, or other materials[.]

Accordingly, the undersigned finds that the Exhibits attached to the parties' pleadings may be

properly considered for purposes of a motion for summary judgment.

**THE RELEVANT LAW**

17

A claim for disability discrimination will survive summary judgment if Plaintiff produces evidence demonstrating "(1) that he has a disability, (2) that he is a 'qualified individual' for the employment in question, and (3) that his employer discharged him (or took other adverse employment action) because of his disability." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015). Under the burden shifting framework of McDonnell Douglas, a plaintiff must first establish a *prima facie* case of discrimination or retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse action. Id. If the employer provides evidence of a nondiscriminatory reason for the action, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's articulated reason is a mere pretext, and that the true reason is either discriminatory or retaliatory. Id.; see also, Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013) (FMLA claims, including those for retaliation and interference, "are analogous to discrimination claims brought under Title VII.")

To establish a *prima facie* case of failure-to-accommodate under the Rehabilitation Act, a plaintiff must show that "(i) she qualifies as an 'individual with a disability' as defined in 29 U.S.C. § 705(20): (2) the [Defendant] had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the [Defendant] refused to make any reasonable accommodation." See Reyazuddin v. Montgomery Cty., Maryland, 789 F.3d 407, 414 (4th Cir. 2015). "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle 1 of the Americans with Disabilities Act of 1990.' " Id. at 413 (internal citation omitted).

18

The ADEA prohibits employers from discharging any individual or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999), quoting Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). A plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id., citing Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).

"To establish constructive discharge, an employee must meet a high standard." Ofoche v. Apogee Med. Grp., 815 Fed. App'x. 690, 692 (4th Cir. 2020). In addition to actually resigning, the employee "must show that his 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Perkins v. Int'l Paper Co., 936 F.3d 196, 211 (4th Cir. 2019) (quoting Green v. Brennan, 578 U.S. 547, 136 S. Ct. 1769, 1777, 195 L.Ed.2d 44 (2016)). The requisite level of intolerability "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have reviewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." Id. at 212 (internal quotation marks and citations omitted). Rather, the employee must show that his working conditions were so intolerable that a reasonable person in his position "would have had *no choice* but to resign." Id. (internal quotation marks and citations omitted) (emphasis in original). "Unless conditions are beyond 'ordinary' discrimination, a complaining

19

employee is expected to remain on the job while seeking redress." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4ᵗʰ Cir. 2019) (additional internal quotation marks and citations omitted); see also Groening v. Glen Lake Cmty. Sch., 884 F.3d 626, 630 (6ᵗʰ Cir. 2018) ("The doctrine [of constructive discharge] does not protect employees who leave their job in apprehension that conditions may deteriorate later. Instead, employees are expected to stay on the job if they can pursue other forms of relief.") (internal quotation marks and citations omitted).

### DISCUSSION

The parties acknowledge that Plaintiff's enumerated claims herein are identical to those recognized during the underlying administrative proceedings:[7]

1. On August 9, 2017, the Plaintiff's supervisor called him into his office, spoke to him in "a very angry tone" about his extended lunch break, and "punched both his fists" on his desk while speaking to him.

2. On August 15, 2017, the Plaintiff's supervisor notified him via telephone that he would be put on a "leave without pay" status because he had not reported for duty.

3. On August 21, 2017, the Plaintiff's request for reasonable accommodation in the form of telework was denied.

4. From August 2017 through November 2017, the Plaintiff's supervisor emailed him multiple times, which he found to be harassing.

5. On September 6, 2017, the Plaintiff's supervisor informed him that his request for advanced annual and sick leave would not be extended by thirty days.

---

[7] This is also corroborated by the information Plaintiff provided to the Court on the thumb drive concerning the underlying administrative proceedings. In sum, Plaintiff's lawsuit concerns these nine claims that he asserts were decided "based on procedural issues and not the merit or evidence presented by the Plaintiff." (see ECF No. 27 at 4)

6. On October 2, 2017, the Plaintiff discovered that his supervisor disclosed his confidential medical information, in violation of the Rehabilitation Act, to a lab technician supervisor via a mailed memorandum about his FMLA request.

7. On November 8, 2017, a Human Resources Specialist notified the Plaintiff that he would no longer be accommodated with leave, and that he needed to return to work after exhausting his Leave Without Pay, or else he could be considered Absent Without Leave or medically disqualified.

8. On December 9, 2017, the Plaintiff was constructively discharged.

9. On April 10, 2018, the Plaintiff discovered that a source at MSHA had provided incorrect information about him to a background investigator.

The following material facts are not in dispute:[8]

1. From July 1, 2012 to December 9, 2017, Plaintiff worked as an Office Automation Assistant with MSHA, a component of the DOL in Mt. Hope, West Virginia.

2. During his employment with MSHA, Plaintiff's immediate supervisor was Defendant Montgomery. Relative to the allegations contained in this action, Plaintiff's second line supervisor was Defendant Gardner, who had no direct working relationship with Plaintiff.

3. Plaintiff has a service-connected disability that includes the following diagnoses: scar tissue; muscle, and nerve damages in both arms and hands; post-traumatic stress disorder (PTSD); stress, anxiety; depression; social isolation; paranoia; sleeplessness; nightmares; intrusive thoughts; and hypervigilance.

---

[8] In addition to the facts set forth in the parties' pleadings, the undersigned observed these facts are supported from the underlying investigation summary submitted by Plaintiff via thumb drive.

4.  Defendant Montgomery was aware Plaintiff had a service-connected disability that was chronic in nature soon after Plaintiff was hired in July 2012.

5.  Defendant Gardner became aware of Plaintiff's service-connected disability on August 15, 2017 when Plaintiff emailed him a request for Reasonable Accommodation.

6.  Plaintiff's birthdate is October 14, 1976 – the claims presented herein indicate that Plaintiff was 40 and then 41 years of age at the time of the alleged discriminatory/retaliatory acts.

7.  Defendant Montgomery's birthdate is November 12, 1965. Defendant Gardner's birthdate is August 24, 1964.

8.  Plaintiff had not filed any prior complaints of discrimination or harassment prior to August 9, 2017.

9.  Plaintiff left the office that day at approximately 11:30 a.m. for lunch.

10. Defendant Montgomery texted Plaintiff at 1:44 p.m. inquiring of his whereabouts.

11. Plaintiff did not respond to the text.

12. The primary topic during the discussion between Plaintiff and Defendant Montgomery concerned Plaintiff's extended lunch break.

13. Plaintiff was not disciplined for taking an extended lunch break.

14. Plaintiff left the office at 3:00 p.m. and did not return or otherwise report for duty since he left on August 9, 2017.

15. Plaintiff had been absent from the office on Thursday, August 10, Friday, August 11, Monday, August 15, and Tuesday, August 15.

16. Defendant Montgomery had not heard from Plaintiff during this time.

17. On August 14, 2017, Plaintiff emailed Paul Tisak in the Pittsburgh office to request a

22

Reasonable Accommodation due to an "incident" with Defendant Montgomery to allow him to telework and/or to come into the office when Defendant Montgomery was not present.[9]

18. On August 15, 2017 Defendant Montgomery emailed and called Plaintiff to ask about his absences and to request that Plaintiff submit medical certification justifying his absences.

19. A note dated August 16, 2017 from Plaintiff's medical provider at the Beckley VA Medical Center indicated that due to illness, Plaintiff was unable to work from August 16, 2017 through September 6, 2017, but "would be able to work by telework until his symptomology is stabilized."[10]

20. Plaintiff's therapist opined in an undated letter that he began treatment with Plaintiff on August 16, 2017, but the exasperation of his service-connected disability began on August 9, 2017.[11]

21. Plaintiff's therapist opined that the "situational conditions" of Plaintiff returning to the workplace environment will further agitate his service-connected disability and he would be unable to perform the functions of the position unless the situational conditions were changed allowing him to fully perform the functions of the position.[12]

22. Full-time telework was unavailable for Plaintiff's position.[13]

23. Defendant Montgomery was on approved leave from September 28, 2017 through October 6, 2017, during which time Joseph Robertson, Branch Chief, was acting Division Chief in

---

[9] See Plaintiff's exhibit "PX 01" at 209-210.
[10] Id. at 322-323.
[11] Id. at 324-325.
[12] Id. at 325.
[13] Id. at 1193.

his absence.

24. Regarding Plaintiff's approved Leave Without Pay under FMLA, Defendant Montgomery received an email on September 29, 2017 from Nicole Lisko, HR Specialist, containing a draft FMLA approval letter for Plaintiff to review and sign.

25. On September 29, 2017, Defendant Montgomery received an email from Defendant Gardner instructing him to "take care of this as soon as possible."

26. On September 30, 2017, Defendant Montgomery emailed Mr. Robertson instructing him to scan the FMLA approval letter and forward to Plaintiff via email as well as send the original via certified mail.

27. On October 2, 2017, Mr. Robertson emailed the letter and mailed the original to Plaintiff.[14]

28. Defendant Montgomery approved Plaintiff's FMLA leave to cover his absences from August 15, 2017 through November 7, 2017.[15]

29. On October 4, 2017, Plaintiff emailed Defendant Gardner, and copied Ms. Lisko, Mr. Paul Sutton, and Mr. Ordie J. Sigmon, III, that he "fully intend[s] to return to duty just not around or under Mr. Montgomery's supervision as I believe the medical certificate outlines" and to "request a transfer to another job position in my local commuting area that wouldn't create any further hardship on me or my family."[16]

30. On November 1, 2017, Defendant Gardner emailed Defendant Montgomery a reminder that several employees, including Plaintiff, would have to complete a mandatory online

---

[14] Id. at 282-283; 328-330.
[15] Id. at 274.
[16] Id. at 275.

24

training course by November 10, 2017.[17]

31. On November 2, 2017, Defendant Montgomery forwarded the email to several employees, including Plaintiff, to remind them to complete their online training.[18]

32. On November 6, 2017, Paul Sutton, Management Analyst, in the Pittsburgh office, emailed numerous employees, including Defendant Montgomery, to remind them to have their employees complete their online training, and listed those employees, including Plaintiff, who had not completed the training.[19]

33. On November 6, 2017, Defendant Montgomery emailed several employees, including Plaintiff, to complete the online training.[20]

34. On November 7, 2017, Plaintiff informed Mr. Sutton, via email, that he did not intend to return to work under the supervision of Defendant Montgomery and requested extended FMLA leave until transferred to a job position away from Defendant Montgomery.[21]

35. On November 7, 2017, Defendant Montgomery emailed Plaintiff requesting that the MSHA/NADL Division laptop be returned; it was agreed that Plaintiff would return the laptop while Defendant Montgomery was not present.[22]

36. On November 8, 2017, Mr. Sutton emailed Plaintiff advising that Defendant Gardner authorized an additional two weeks of Leave Without Pay to explore transfer opportunities and warned Plaintiff that at the end of the two-week period that he would need to return to work or otherwise be considered Absent Without Leave or the Office of Employee Safety

---

[17] Id. at 290.
[18] Id.
[19] Id. at 292.
[20] Id.
[21] Id. at 289.
[22] Id. at 295-294.

and Health may need to review Plaintiff's medical ability to perform his work, possibly resulting in a medical disqualification.[23]

37. On or about December 1, 2017, Plaintiff advised that he no longer needed an accommodation because he was offered a position at the Veterans Administration and that he accepted it.[24]

38. On December 5, 2017, Plaintiff completed a Separation Form DL1-107A stating his "exit date" from Defendant Agency's employment was December 9, 2017.[25]

39. Plaintiff filed a formal complaint of discrimination, based on the foregoing claims, on February 26, 2018.

40. An EEOC AJ granted the DOL's motion to dismiss Plaintiff's complaint on September 23, 2019.

41. The DOL issued a final decision on Plaintiff's complaint on January 14, 2020.

42. Plaintiff appealed the final decision to the EEOC, which affirmed the final decision on June 8, 2021.

43. The bases for each of Plaintiff's claims of discrimination include: disability (specifically, for purposes herein, concern PTSD (see ECF No. 27 at 2, 9)); age; and in retaliation of prior EEO activity.

**Discrimination Based on Disability**

Regarding Plaintiff's claim concerning Defendants discriminated against him based on his disability, he has presented no evidence to substantiate this allegation. While it remains

---

[23] Id. at 288.
[24] Id. at 1262.
[25] Id. at 1220.

undisputed that Plaintiff has a recognized disability through the VA and is a qualified individual as a disabled person, the evidence does not demonstrate he was discriminated against on this basis, save for Plaintiff's own conclusory statements and simple denials to Defendants' pleadings. Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995) (hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment). As an additional matter, Plaintiff indicated that the EEOC process was unfair to the extent it "did not allow" him to "litigate and provide evidence at a formal hearing", and the decisions rendered below were "made based on procedural issues", however, he also indicates that the "provided evidence and undisputed facts contained in this filing" prove he is entitled to summary judgment. (ECF No. 27 at 1) Significantly, the "undisputed facts" alluded to in Plaintiff's argument show that a very thorough investigation was launched shortly after Plaintiff made a complaint regarding the August 9 incident with his immediate supervisor. It is the same facts or circumstances relied upon by the Agency during the underlying proceedings that Plaintiff relies upon in this action. Nevertheless, even assuming *arguendo* that Plaintiff established a *prima facie* case of disability discrimination, he has not overcome Defendants' articulation for a legitimate, nondiscriminatory reason for each of its actions.

For starters, regarding Plaintiff's first claim of being discriminated against on August 9, 2017, as he was allegedly taking a policy-approved extended lunch break to attend medical appointments, again, assuming he was chastised by his immediate supervisor for taking a longer break than allowed, Plaintiff was never disciplined for this. Plaintiff also does not provide any factual support to counter Defendant Montgomery's argument that only Plaintiff took advantage of his generous lunch break policy or other employees were able to enjoy two-hour lunch breaks,

but not him. Regardless, the fact remains that Plaintiff and Defendants concede that the incident occurring on August 9, 2017 was the result of Plaintiff's protracted lunch break – and did not directly involve Plaintiff's disability.

Regarding Plaintiff's claims that occurred on August 15, 2017, once again, although Plaintiff alleges this related to his disability, he does not overcome Defendants' actions that the email and follow-up phone call only involved his absence from work for several days – a legitimate, nondiscriminatory reason compelling Defendant Montgomery to contact Plaintiff. Though Plaintiff asserts he provided Defendant Montgomery medical documentation on August 21, 2017 and August 19, 2017, via email and leaving same on his desk, respectively (see ECF No. 27 at 18), does nothing to vitiate against the nondiscriminatory reason for Defendant Montgomery's August 15, 2017 email.

Regarding Plaintiff's claim that his request for Reasonable Accommodation to telework fulltime on August 21, 2017 or to only come into the office when Defendant Montgomery was not present[26] was a product of disability discrimination, he fails to counter Defendants' argument that his job duties did not provide for fulltime telework, but required his physical presence in the office. Indeed, Plaintiff's allegations to this extent are belied by the fact that the August 9, 2017 dispute between himself and his immediate supervisor, Defendant Montgomery, was over whether Plaintiff had taken an extended lunch break. To this extent, Plaintiff fails to show that denial of his request to telework or only come in when his immediate supervisor was not in the office was determined solely on the basis of his disability.

---

[26] Plaintiff characterizes this as "a request for telework part time and come in on night shift if necessary" (ECF No. 27 at 20) while he receives treatment for the aggravation of his disabilities as a result of the August 9, 2017 event.

Regarding Plaintiff's claims that he found Defendant Montgomery's emails to him harassing, but yet again, he presents no evidence to contradict that the emails were sent for legitimate and nondiscriminatory reasons: as noted *supra*, the August 15 email concerned his absence from work without any notification as to why; the November 2, 2017 email was forwarded from Defendant Gardner and copied to five other employees and concerned a reminder to complete mandatory training; the November 6, 2017 email was a follow-up reminder of the mandatory training and also copied to two other employees who had not completed the training; the November 7, 2017 email only concerned Plaintiff's possession of a laptop for nearly three months, during which most of that time Plaintiff was not working, and it was not specifically assigned to Plaintiff, but shared by other employees for purposes of teleworking.[27]

Regarding Plaintiff's claim that the September 6, 2017 denial to his request for advanced annual and sick leave would not be extended by thirty days, it is notable that he does not deny the fact that Defendants determined he had an annual leave balance of "0.0 hours" and a "negative sick leave balance of 152 hours", and instead only relies upon factors unrelated to application of the DOL's policies on advancing leave. (ECF No. 27 at 33) The pertinent policy or regulation referred to by the parties provides the following language: "Annual leave may not be advanced

---

[27] Plaintiff contends that "[t]his issue goes beyond emails and began when Mr. Montgomery verbally and physically threatened, laughed at the Plaintiff, provided false and incorrect information, provided unfounded opinions, and was allowed to do so by Mr. Gardner and the AGENCY", he also points out that Defendant Montgomery was "questioned" about these issues by Defendant Gardner "which most certainly added to the discriminatory actions taken against the Plaintiff. (PX 01 pg. 1242)" (ECF No. 27 at 30) The undersigned notes that Plaintiff's "PX 01" refers to the thumb drive that he noticed as an "alternative filing" (ECF No. 33) and pertains to an affidavit from Defendant Gardner dated August 24, 2018 from the underlying administrative proceedings that concerned an "EEO Investigative Affidavit" wherein Defendant Gardner noted Plaintiff's "11-8-2017 suggestion that [Defendant Montgomery] drinks during work hours and may have been drinking alcohol on the day of the [August 9, 2017] incident. There was no evidence to support this statement." Notably, Defendant Gardner affirmed that Plaintiff's disability or medical impairment was not a factor in any of Defendants' actions or decisions regarding Plaintiff's claims of harassing emails. (See "PX 01" at 135)

to employees for whom future accrual of annual leave is doubtful." (See ECF No. 29 at 6, ¶2.b.) It is also significant that approval for requests for annual leave, whether accrued or advanced, is a discretionary function for DOL Agency Heads or their designees. (Id., ¶1.a.)[28] The same prohibitions against advancing annual leave also apply to requests for advanced sick leave. (Id. at 16, ¶3.b.)[29] It is apparent that Defendants' reliance on the applicable policies, thus driving the decision to deny Plaintiff's requests for thirty days' advance annual and sick leave, was wholly irrelevant to Plaintiff's disability status.

Regarding Plaintiff's claim that his sensitive medical information was impermissibly shared by Defendant Montgomery in processing Plaintiffs FMLA request on October 2, 2017 also bears no semblance to his allegation of discrimination based on his disability. Plaintiff maintains that the sensitive information was in an attached memorandum in an email Plaintiff received from Mr. Robertson which was forwarded from Defendant Montgomery who was on leave at the time. The sensitive medical information stated: "On September 28, 2017 I received medical certification from the Department of Veterans Affairs signed by Wesley Bailey, PTSD therapist, MSW, LGSW, in support of your request for FMLA."

As noted *supra*, there is no dispute that Mr. Robertson was acting as Division Chief during Defendant Montgomery's absence and that both acted in concert to ensure that Plaintiff received

---

[28] Moreover, it is also noteworthy that these regulations provide that "under no circumstances may an employee be advanced annual leave that would result in a negative annual leave balance at the beginning of the next leave year." (ECF No. 29 at 6, ¶2.e.) While it is arguable that Plaintiff would have been able to repay or earn back thirty days' worth of annual leave in the last four months of the year, the fact that he had an annual leave balance of 0.0 at the time of his request for advance leave seems in jeopardy, but a minimum, could have triggered application of this provision.
[29] Additionally, it is questionable whether the following provision also applies here, to-wit: "If an employee is indebted to DOL for advanced sick leave, the employee is not entitled to further use of sick leave until the entire balance of advanced sick leave has been repaid or until an additional sick leave balance has been approved." (Id. at 16, ¶3.h.) Given Plaintiff's negative balance of 152 hours, this only further underscores Defendants' contention that DOL policy precluded any further advance of sick leave.

the approved FMLA letter as soon as possible pursuant to Defendant Gardner's instructions. While Plaintiff takes issue with his medical diagnosis and therapist's name and credentials being disclosed, at no time does he present any evidence that discredits the fact that Defendants and other Agency employees were acting within the scope of their duties to ensure that Plaintiff was promptly notified of his approved leave. Plaintiff also complains that certain individuals had knowledge of his request for Reasonable Accommodation with supporting medical information, but provides no evidence, other than they had "no right or need to know", that these individuals were involved in providing administrative assistance on personnel-related issues, including processing requests for leave and/or a Reasonable Accommodation, as both necessarily concerned Plaintiff's medical condition.[30] Moreover, despite Plaintiff's argument that the approved FMLA letter could have been taken care of by Defendant Montgomery upon his return to the office (ECF

---

[30] Plaintiff references several instances in his exhibit "PX 01" at pages 1289-1290, 1295, 1330, and 1337, as examples of how certain individuals such as Mr. Sutton and Ms. Pfabe had no right or reason to be a aware of or access to Plaintiff's medical information (ECF No. 27 at 37), however, Plaintiff fails to show how these individuals should not be involved in processing his requests for Reasonable Accommodation or leave, but demonstrates the opposite – both were involved in attempting to process Plaintiff's requests despite not being Mount Hope employees, but located in the Pittsburgh office, as Plaintiff refused any contact with his immediate supervisor, Defendant Montgomery. It further appears that Plaintiff's contention that Ms. Pfabe should not have been privy to his request for Reasonable Accommodation or medical information is disingenuous, as his exhibit "PX 01" shows that following Defendant Montgomery's email dated August 15, 2017 advising Plaintiff of his responsibilities to request leave, Plaintiff himself copied Ms. Pfabe and Mr. Sutton, including Defendants Montgomery and Gardner and others, a redacted doctor's letter in an email dated August 21, 2017 concerning his recent absences and request for Reasonable Accommodation. (See "PX 01" at 1334) Additionally, this evidence only highlights the unusual circumstances these individuals found themselves in, given that Plaintiff did not return to the office after August 9, 2017, and refused contact with his immediate supervisor, Defendant Montgomery, as he notified these individuals in the August 21 email in pertinent part:

> I attempted to keep this situation as private as possible by engaging management staff first as directed on Labornet. I would also like to note that I used leave on Wednesday 8/9 the date of the initial incident in order to remove myself from the situation. I consequently used leave the following days 8/10 and 8/11 for medical appointments at the VAMC and illness which Mr. Montgomery was notified of using the usual procedure. My notification for the absence from work for the duration of 8/14 – 8/18 was made to the lead OAA Paul Tisak and Chief PSHTC George Gardner when I requested a Reasonable Accommodation . . . My medical letter states I will need to be out of the office from August 16th – September 6th as of now and will be receiving continuing treatment at the Beckley Veterans Hospital.

No. 27 at 38-39), this ignores the undisputed fact that Defendant Montgomery was instructed to take care of the matter as soon as possible.[31]  As an additional matter, given the fact that Plaintiff refused contact with Defendant Montgomery, Plaintiff's self-serving argument that this matter could have waited until he returned from leave further belies his allegation of disability discrimination, but underscores that he was being treated favorably due to his disability.

Regarding Plaintiff's claim that he was discriminated on November 8, 2017 when he was informed he would no longer be accommodated with leave and that he needed to return to work after exhausting his Leave Without Pay or else be considered Absent Without Leave or medically disqualified, there is no evidence supporting this claim. Indeed, Plaintiff does not dispute that his leave expired on November 7, 2017, that he was generously extended an additional two weeks of Leave Without Pay, or that Defendants were only following the pertinent DOL policies governing expired leave. Plaintiff also does not dispute Defendants' argument that Plaintiff himself needed to supply the necessary medical documentation and insistence he have no contact with Defendant Montgomery that brought into question his medical ability to continue in his job. Instead, Plaintiff bizarrely asserts that additional leave is a form of Reasonable Accommodation and had his requests for same were "handled properly", "he should not have had to invoke FMLA." (ECF No. 27 at 40-41) Plaintiff simply fails to show any evidence of discrimination or that these legitimate, non-discriminatory reasons for not providing additional leave were pretextual.

Regarding his claim that on December 9, 2017 that he was constructively discharged, there

---

[31]  Although Plaintiff states the email "simply stated as soon as possible", and that Defendant Montgomery could have waited a few more days (ECF No. 27 at 29), whether Defendant Montgomery could have taken care of matters a week later upon his return is of no moment, as Plaintiff fails to demonstrate how Defendant Montgomery's prompt response was discriminatory.

is no dispute that Plaintiff left the Agency effective that day to take a position at the Beckley VA. Plaintiff merely states that his constructive discharge "was an amalgamation of every discriminatory action" performed by Defendants, and then asserts a new allegation that Plaintiff notified Defendant Montgomery of "ongoing harassment from another NADL employee which was of a constant and ongoing nature during his employment at the NADL." (Id. at 42) Plaintiff then alleges that Defendant Montgomery "ignored" Plaintiff's complaints because he was good friends with the individual and his family members were also employed by the Defendant Agency. (Id.) A federal court cannot consider new allegations outside a motion to amend. See Weldon v. Nohe, No. 3:16-cv-3815, 2016 WL 7042931, at *3 (S.D.W. Va. Dec. 2, 2016 (Chambers, C.J.), citing Mohammed v. Daniels, No. 5:13-CT-3077-FL, 2015 WL 470469, at *3, n.2 (E.D.N.C. Feb. 4, 2015) ("To the extent plaintiff attempts to raise new claims in his responses to defendants' motions to dismiss, those claims are not properly before the court and will not be considered.") (citing Henson v. Lambert, No. RWT-12-3271, 2013 WL 4008882, at *1, n.1 (D. Md. Aug. 2, 2013), appeal dismissed, 557 Fed. App'x. 245 (4th Cir. 2014)). Thus, to the extent that Plaintiff has alleged a new allegation in his response to Defendants' motion to dismiss/motion for summary judgment, the undersigned declines to consider same. In any event, as Plaintiff fails to provide more than conclusory allegations that his separation from the Defendant Agency was the result of being forced to resign due to Defendants' failure to grant his requests for Reasonable Accommodation and/or extend him additional leave; Plaintiff fails to overcome the evidence within his own exhibit, "PX 01", that his separation was voluntary and not due to discrimination.

Finally, regarding Plaintiff's claim that he discovered on April 10, 2018 that Defendant Gardner provided incorrect information to a background investigator in connection with his

application for employment at the Beckley VA, Plaintiff fails to demonstrate any nexus between the alleged incorrect information and a discriminatory act. Plaintiff points out that this claim arises from information provided by Defendant Gardner in an OPM INV FORM 41 entitled "Investigative Request for Employment Data and Supervisor Information" (see "PX 01" at 1260-1261). It is noted that Defendant Gardner is advised from the onset that his name was provided by Plaintiff to assist in completing the background information to determine Plaintiff's suitability for employment or security clearance. (Id. at 1260) The information at issue concerns the fact that Defendant Gardner marked on the checklist form that Plaintiff "left employment by mutual agreement due to specific problems" and, per the checklist instructions provided, explained under "item 6" that "employee resigned after extended absence due to medical disability aggravated by conflict with supervisor – I am second level supervisor." (Id. at 1261) As noted *supra*, Plaintiff takes issue with the indication that he left by "mutual agreement", insisting that he was forced to resign. Despite Plaintiff's contention that he did not leave by "mutual agreement", he fails to show how this harmed him, beyond merely accusing Defendant Gardner of doing so "for malicious purposes." (ECF No. 27 at 44) Even from the overall record of evidence, this information can hardly be characterized as "incorrect", let alone provided "for malicious purposes." Oddly, Plaintiff suggests that Defendant Gardner "could have easily checked (b) LEFT EMPLOYMENT VOLUNTARILY/EMPLOYMENT ENTIRELY FAVORABLE." (Id.) (emphasis in original) However, this suggestion does nothing to advance his claim of constructive discharge. Nevertheless, while Plaintiff's claim to this extent is premised on discrimination as a result of his disability, he utterly fails to demonstrate any factual support for this allegation.

In summation, it appears that Plaintiff's claims as they relate to his allegations that he was

discriminated against for his disability are nothing more than he takes umbrage to the denial of his requests that he be provided additional leave time and that his requests for Reasonable Accommodation to adhere to his specific requirements that he not have contact with Defendant Montgomery since August 9, 2017, merely relies upon the fact that he happens to have a recognized disability. Moreover, Plaintiff's allegations fail to demonstrate that Defendants' actions in each of the situations described above were not done for legitimate, non-discriminatory reasons, or that they were even pretextual.

### Discrimination Based on Age

To the extent Plaintiff's allegations rest upon age discrimination under ADEA, there is even less factual support: he shown no evidence that because of his age, he was treated differently than his peers, or that his age had any bearing on the decisions or actions taken by Defendants. Plaintiff has not carried his burden that his age was the "but-for" cause of any of the challenged adverse employment actions. See Gross v. FBL Financial Services, Inc., 557 U.S. 167, 180, 129 S.Ct. 2343, 2352, 174 L.Ed.2d 119 (2009).

For example, with regard to his first claim, the August 9, 2017 incident, there is no merit to the claim that Defendant Montgomery was allegedly angry that Plaintiff took a longer lunch than allowed due to his age. From the investigative report below, Plaintiff's contention that his age was a factor in this issue "because he believes Mr. Montgomery looked down upon his medical issues, which are increasing with age, and his medical appointments were an issue for him[]", is nothing more than speculation. (See Plaintiff's exhibit "PX 01" at 123) It is apparent from the pleadings in this case that Plaintiff's extended lunch break was the primary reason for Defendant Montgomery calling him out that day.

Likewise, Plaintiff's third claim, that he was denied telework, is devoid of a sufficient factual basis for an age discrimination claim: despite alleging that a "younger female employee" was permitted to telework to allow her to wait for packages to arrive at her home and to visit with her family members who worked at the Pittsburgh Safety Health and Technology Center, Defendant Montgomery denied having any recollection of allowing telework under such circumstances (See Id. at 131, 132).[32] To the extent that Plaintiff has alleged a disparate treatment claim under ADEA or Title VII, it is also significant that he provides no factual support indicating that this individual was similarly situated to himself.[33] For instance, Plaintiff fails to describe this employee's job duties or position with the Agency, period of service, or even whether she reported directly to Defendant Montgomery. Indeed, in reference to his remaining claims, Plaintiff himself admitted his age had nothing to do with those issues. (See Id. at 128, 134, 137, 141, 143, 147, 151)

**Retaliation Claim**

In support of his retaliation claim, Plaintiff has alleged that he was subjected to retaliation for having a medical impairment, for requesting a Reasonable Accommodation, as well as for reporting harassing conduct. ("PX 01" at 121) Plaintiff asserted that both Defendants Montgomery and Gardner were aware of this protected "prior EEO activity" when they were contacted by the EEO regarding Plaintiff's allegations. (Id.)

---

[32] As an additional matter, even assuming Plaintiff's allegations are true to this extent, allowing telework to receive packages at home and to visit with family who live and work out of state, is not the same as requesting telework on a full-time or even part-time basis – especially because Plaintiff sought telework to avoid any contact with his immediate supervisor.

[33] See, generally, Cepada v. Board of Educ. Of Baltimore County, 814 F.Supp.2d 500, 513 (D. Md. Apr. 28, 2011) ("An ADEA disparate treatment plaintiff must allege: (1) he is at least 40; (2) adverse employment action; (3) satisfactory job performance; and (4) similarly-situated younger employees received more favorable treatment.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)). To be sure, "similarly situated" to the favorably treated employee requires a showing of "similar[ity] in all relevant respects." Haywood v. Locke, 387 Fed. App'x. 355, 359 (4th Cir. 2010); 29 U.S.C. § 623(a).

Plaintiff conceded that his first claim, the August 9, 2017 incident, had nothing to do with his prior EEO activity or related to his retaliation claim. (Id. at 127) However, regarding his remaining claims, Plaintiff contends that each act was in retaliation for his reporting Defendant Montgomery for the August 9, 2017 incident. (Id. at 129, 132, 136, 139, 142, 146, 150, 153) The report or complaint in question concerned an email Plaintiff sent to Paul Tisak with the Mine Safety and Health Administration on August 14, 2017 explaining the following:

> Due to a work related incident with my supervisor on Wednesday 8/9/2017 I am unable to go into the office at this time. On advisement from an AFGE representative I would like to request a Reasonable Accommodation due to aggravation of my Service Connected Disabilities. I would like to request I be allowed to Telework until this matter has been resolved. If my presence is required at the office I can go in after Mr. Montgomery has left the premises to perform those functions. I will gladly comply with any reasonable requests from George Gardner or yourself concerning this matter. My union representation is outside of the District 4 offices due to the relationship the representatives there have with Mr. Montgomery. Thank you for your time in this matter and I will update you or the proper person if you would like to refer me to someone else.[34]

(Id. at 44; see also, Id. at 78-79) Nevertheless, as discussed *supra*, Plaintiff fails to allege sufficient factual support that Defendants retaliated against Plaintiff for complaining about his immediate supervisor in these remaining claims. As mentioned previously, Plaintiff has provided a through history of the events comprising his claims as contained in the thumb drive exhibit: if anything, this evidence is remarkable to the extent that it shows how all the individuals, including Defendants Montgomery and Gardner, who assisted or attempted to assist Plaintiff in his pursuit of a Reasonable Accommodation, a transfer to another position within his locality at the same pay grade, or to extend additional leave despite Plaintiff's zero and negative balances. What this evidence does not show, however, is that Defendants retaliated against Plaintiff after his initial

---

[34] That same day, Mr. Tisak forwarded the email to Paul Sutton.

complaint regarding the workplace incident on August 9, 2017 with Defendant Montgomery. For instance, contrary to Plaintiff's assertion that his request to telework was denied on the basis of retaliation – the facts demonstrate his job description did not support full-time telework, thus the reason why his request was denied. Plaintiff's assertion is further belied by the fact that Defendant Montgomery recommended and allowed for Plaintiff to telework on September 15, 2017 (Id. at 39, 71). The evidence shows that any delays concerning his requests for a Reasonable Accommodation, or to remain on leave for medical reasons, were caused by Plaintiff: he advised that his medical provider recommended he remain off work pending treatment, but also recommended that he could telework, thus triggering DOL policy that Plaintiff submit appropriate medical certification for same.

In sum, while none of Plaintiff's remaining eight claims in connection with his allegations that Defendants retaliated against him enjoy sufficient factual support to make a *prima facie* case, Plaintiff fails to demonstrate that Defendants had no legitimate, non-discriminatory reasons behind their decisions or actions, let alone a pretext for same.

### Failure to Accommodate Claim

Plaintiff has also alleged Defendants violated the Rehabilitation Act by failing to process his requests properly or refusing them. In light of the four elements required to show a *prima facie* case under this claim, *supra*, while there is no dispute that Plaintiff qualifies as an individual with a disability and that Defendants had notice of same, there is disagreement as to whether Plaintiff's request for Reasonable Accommodation was in fact reasonable.

Defendants contend that Plaintiff's job position was not amenable to full-time telework. Plaintiff contends that he did not ask for full-time telework, as he could have come into the office

after hours for those duties that required his presence when Defendant Montgomery was not in the office. (ECF No. 27 at 19) Defendants argue that Plaintiff's request was essentially a request for another supervisor, which is unreasonable on its face. (ECF No. 24 at 9). Plaintiff disputes that he ever requested a different supervisor as an accommodation. (ECF No. 27 at 19) Accordingly, whether Plaintiff could have performed the essential functions of his job with his particular accommodations, that is, to telework and only come into the office when his immediate supervisor was not present, presents a question as to whether Plaintiff's request is reasonable on its face. See, e.g., US Airways, Inc. v. Barnett, 535 U.S. 391, 401-402, 122 S.Ct. 1516, 1523, 152 L.Ed.2d 589 (2002).

It is apparent that from Plaintiff's own pleadings that he remained capable of performing the essential functions of his job, so long as his immediate supervisor was not present. While Plaintiff contends that he could telework for certain duties[35], he clearly concedes that his other job duties required him to be present at the office. Of significance is that Plaintiff's job was a "secretary" position that "serves as personal assistant to the National Air and Dust Laboratory Division (NADL) Chief and staff, PSHTC, and provides administrative and secretarial support" as well as "performs secretarial work under the general supervision of the Division Chief and accepts individual assignments from him . . . and carries out the assignments in accordance with the established policies and practices of the office."[36] ("PX 01" at 1215, 1217). There is no dispute that Defendant Montgomery was the Division Chief, and as noted numerous times, Plaintiff's

---

[35] It is also interesting that Plaintiff's "telework agreement" allows telework for eight hours only without supervisory approval, which implicitly means that Defendant Montgomery would have to approve of telework beyond eight hours – and that Plaintiff had been aware of this provision since at least January 5, 2016. ("PX 01" at 247)

[36] A more thorough and complete description of Plaintiff's position and duties is set forth in Plaintiff's exhibit "PX 01" at 1215-1219.

immediate supervisor. It is important to recognize that when "an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job" and that other relevant evidence can include an employer's "judgment as to which functions are essential". See Jacobs v. N.C. Administrative Office of the Courts, 780 F.3d 562, 579 (4th Cir. 2015). Plaintiff's request – to essentially avoid all contact with his immediate supervisor – is facially unreasonable. Indeed, for tasks including processing requests for Reasonable Accommodation as well as being given specific assignments, Plaintiff opted to go through other officials, mainly those who worked outside of the Mount Hope office, so that he could avoid even email contact with his immediate supervisor. See, generally, Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 Fed. App'x. 314, 323 (4th Cir. 2011) ("an accommodation that would require other employees to work harder is unreasonable"); see also, Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 20 (1st Cir. 1998) (employer not required to reallocate job duties in order to change the essential function of a job); see also Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 81 (1st Cir. 2010) (employer not required to provide an accommodation that removes an essential function of the position); Charette v. St. John Valley Soil and Water Conservation District, 332 F.Supp.3d 316, 364 (D. Maine, Aug. 17, 2018) ("The Court is unaware of any precedent to suggest that essentially requesting the ouster of an organization's leader is facially reasonable or does not present an undue hardship.") Because Plaintiff's request for Reasonable Accommodation to this extent is facially unreasonable, he fails to show a *prima facie* case that Defendants violated the Rehabilitation Act by not making such an accommodation. Moreover, for reasons discussed further, *infra*, Plaintiff's alternative requests for Reasonable Accommodation, to the extent that he wanted to be transferred to another position

40

within his locality and of equal pay grade, also fail to show Defendants violated the Rehabilitation Act, because there were no positions fitting that criteria that were available.[37] (ECF No. 23-2 at 9; "PX 01" at 300, 308)

### Hostile Work Environment Claim

The parties acknowledge that in order for Plaintiff to establish a *prima facie* hostile work environment claim, he must show that: (1) he was subjected to an intimidating, hostile, or offensive work environment; (2) the conduct was based on Plaintiff's protected status; (3) the conduct was sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment and create an abusive work environment for a reasonable person under similar circumstances; and (4) at the time such conduct occurred and as a result of such conduct, Plaintiff subjectively perceived his work environment to be abusive. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 82 (2001).

While Plaintiff may subjectively perceive that all his nine claims constitute instances of discrimination, thus creating an abusive work environment, simply put, even in combination, these events fail to demonstrate the necessary "severe or pervasive" threshold necessary to support a hostile work environment claim. "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with

---

[37] While Plaintiff does not appear to be making a claim that Defendants interfered with his requests or invocation for FMLA, because the underlying record and the pleadings filed herein clearly show that Plaintiff's FMLA requests were granted and even generously extended, Plaintiff cannot claim any such interference caused him harm. See, generally, 29 U.S.C. § 2615(a)(1) (employee must show the interference prejudiced him, but no prejudice where employer approve requests for FMLA leave); Gordon v. U.S. Capitol Police, 778 F.3d 158, 164 (D.C. Cir. 2015)

[one's] supervisor, are not actionable under Title VII." Id., 521 F.3d at 315-316 (internal quotation marks and citations omitted); see also, Greene v. A. Duie Pyle, Inc., 170 Fed. App'x 853 (4th Cir. 2006)(pornography magazines in the workplace cafeteria, the men's room, and sexually offensive faxes, cartoons and emails posted near a time clock were not severe or pervasive enough to establish a hostile work environment); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996), cert. denied (supervisor's sexual innuendos, jokes and physical contact was not sufficiently severe or pervasive to create a hostile work environment). Thus, even construing Plaintiff's allegations under the most liberal construction fail to demonstrate that Defendants' alleged misconduct was "sufficiently continuous" or "pervasive" to rise to actionable levels. See Shields v. Federal Express Corp., 120 Fed. App'x. 956, 961 (4th Cir. 2005); Bannerman v. Potter, 2002 WL 32509029, at *8 (S.D.W. Va. Sept. 30, 2002) (Copenhaver, J.) (defendant entitled to summary judgment on plaintiff's claim of hostile work environment where objectionable behavior was not actionable because there was no evidence that the incident was part of a longstanding pattern of hostile and intimidating conduct); Fairmont Specialty Serv. v. West Va. Human Rights Comm'n, 206 W. Va. 86, 96, 522 S.E.2d 180, 190 (1999) (holding that "[m]ore than a few isolated incidents" are required). As noted supra, Plaintiff worked for the Agency for over five years without any complaint of being harassed or discriminated against on the basis of his age, disability, or engagement in any protected activity. Notably, Plaintiff's prior requests for Reasonable Accommodation were granted, long before the incident on August 9, 2017.[38] Nevertheless, this single episode – of a supervisor chastising an employee over an extended lunch break – is the

---

[38] For example, Plaintiff submitted evidence showing that in July 2012, shortly after being hired, Defendant Montgomery approved his request for Reasonable Accommodation on account of his dexterity issues connected with his service-related disabilities. ("PX 01" at 1181-1185)

primary reason and foundation of Plaintiff's complaints regarding all subsequent events. In short, no "reasonable person under similar circumstances" would find these events or actions, either individually or in the aggregate, to be severe and pervasive or even hostile or harassing. In sum, as discussed *supra*, because none of Plaintiff's claims enjoy factual support from the underlying record, thus failing to make a *prima facie* showing of discrimination on any ground (disability, age, retaliation), he is likewise unable to substantiate his claim that he was subjected to a hostile or abusive work environment to the extent that altered the conditions of his employment.

### Constructive Discharge Claim

Under the jurisprudence governing such claims, set forth *supra*, the facts simply do not support Plaintiff's allegation that he was forced or had no choice but to resign. As stated earlier, Plaintiff's claims stem from a single episode on August 9, 2017 involving a dispute over an extended lunch hour with Defendant Montgomery, and as a result, Plaintiff could no longer to work in his presence. Indeed, his initial request for Reasonable Accommodation shows that he intended to return to duty, "just not around or under Mr. Montgomery's supervision" (ECF No. 23-2 at 8; see also ECF No. 27 at 19, 24). Though Plaintiff disputes Defendants' contention that there were no other job vacancies within the same pay grade or locality allowing for a transfer in accordance with his requests for Reasonable Accommodation, he does not acknowledge that the positions, while appearing "vacant" were not "funded", thereby rendering them unavailable.[39] (ECF No. 23-2 at 9; "PX 01" at 300, 308) Regardless, since the evidence submitted to this Court

---

[39] Plaintiff cites the relevant provisions governing processing specific types of Reasonable Accommodation requests, which specifically provides that reassignment "will be considered as a reasonable accommodation only as a last resort after all possible accommodations have been explored and ruled ineffective." (ECF No. 27 at 26) He further acknowledged that "[r]eassignments will be made to vacant funded positions only." (Id. at 27) Indeed, Plaintiff explicitly advised he would not accept a reassignment to a position that was at a lower grade, as he would deem such a transfer a "punishment." (Id.; see "PX 01" at 308)

fails to demonstrate that Plaintiff was discriminated against in the first place, and that he remained on leave following the incident on August 9, 2017 (excepting the one day he was permitted to telework on September 15, 2017) until he advised he no longer required accommodation due to accepting another position at the VA about December 1, 2017[40], Plaintiff has not shown his working conditions during this period were so intolerable that he was "compelled to resign." <u>Green v. Brennan</u>, 578 U.S. 547, 555, 136 S.Ct. 1769, 1776, 195 L.Ed.2d 44 (2016) (quoting <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

Based on the foregoing, the undersigned **RECOMMENDS** that Defendants are entitled to dismissal of this matter.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT _Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment_** (ECF No. 23), **DISMISS** Plaintiff's Complaint (ECF No. 1) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Frank W. Volk. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections

---

[40] Incidentally, Plaintiff's new position at the Beckley VA was a "lateral move", not a demotion or promotion. ("PX 01" at 1552-1553)

identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on any opposing parties, District Judge Volk and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to the *pro se* Plaintiff and to counsel of record.

ENTERED: March 22, 2022.



Omar J. Aboulhosn
United States Magistrate Judge